**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

S.H., *et al.*,                                    )
                                                   )
            Plaintiffs,                            )
                                                   )
v.                                                 )          Civil Action No.: 1:11-cv-128
                                                   )
FAIRFAX COUNTY BOARD                               )
OF EDUCATION,                                      )
                                                   )
            Defendant.                             )

## MEMORANDUM OPINION

Before the Court are cross-Motions for Judgment on the Administrative Record. (Dkt.

Nos. 13 & 15). This matter returned to the Court following remand to the administrative hearing

officer for clarification of his opinion. For the reasons that follow, the Court DENIES Plaintiffs'

Motion for Judgment on the Administrative Record. Furthermore, the Court GRANTS

Defendant's Motion for Judgment on the Administrative Record and DISMISSES S.H.'s

Complaint.

## BACKGROUND

In this action, George and Barbara Hopkins (the "Parents") bring suit on behalf of their

daughter, S.H., under the Individuals with Disabilities Education Improvement Act, 20 U.S.C.

§ 1400 *et seq.* ("IDEA") for Fairfax County Board of Education's ("FCBE") failure to provide

S.H. with "free and appropriate public education" ("FAPE"). The Parents contest the decision of

an administrative hearing officer (the "Hearing Officer") that they are not entitled to receive

tuition reimbursement for S.H.'s enrollment at the Lab School of Washington ("Lab" or "Lab

School") during the 2007-2008, 2008-2009, 2009-2010, and 2010-2011 school years. The

Hearing Officer concluded that the Individualized Education Plans ("IEPs") proposed by Fairfax

County Public Schools ("FCPS") for each year in question would provide S.H. with a FAPE.

S.H. has average intelligence but significant education needs. At the time these

proceedings began, S.H. was fourteen years old. FCPS found S.H. eligible for special education

on January 26, 2005, during her second grade year. After a series of evaluations, the FCPS local

screening committee found S.H. demonstrated auditory memory and visual motor integration

disorders and had difficulty with reading, written expression, and verbal expression. S.H.

continued in the FCPS system in the third and fourth grades. Although Fairfax County is S.H.'s

local school district, her Parents placed her at Lab, an out-of-district private special education

school, for her fifth grade year. S.H. has attended Lab since that time. On July 30, 2010, the

Parents requested a Due Process hearing, claiming that the in-district placement within the FCPS

system was inappropriate and not reasonably calculated to confer educational benefits upon S.H.,

and that the appropriate educational placement was at Lab. Hearings were held before Hearing

Officer George C. Towner over eight days in October 2010. The Hearing Officer heard

testimony from eighteen witnesses and the administrative record grew to encompass thousands

of pages.

On November 22, 2010, the Hearing Officer issued a fifty-five page decision, finding

FCPS' proposed IEPs would provide S.H. with a FAPE for each of the four school years at issue.

The Parents filed this action on February 4, 2011. The Parties filed cross-Motions for Judgment

on the Administrative Record on August 19, 2011. The Court heard oral argument on the cross-

Motions on September 23, 2011, and took the Motions under advisement. The Court then

remanded the matter to the Hearing Officer for clarification of his decision. The Hearing Officer

provided a revised decision on January 31, 2012. The Parties provided supplemental briefing

addressing the Hearing Officer's revised decision. This matter is now ripe for disposition.

## A. The Individuals With Disabilities Education Act

Before addressing the facts of this matter, the Court pauses to provide a brief background

of the IDEA. The purpose of the IDEA is to "ensure that all children with disabilities have

available to them a free appropriate public education that emphasizes special education and

related services designed to meet their unique needs and prepare them for further education,

employment and independent living." 20 U.S.C. § 1400(d)(1)(A). To meet its goal, the IDEA

requires states receiving federal education funds to provide disabled children with a FAPE. 20

U.S.C. § 1412(a)(1)(A); *Sumter Cnty. Sch. Dist. 17 v. Heffernan*, 642 F.3d 478, 483 (4th Cir.

2011). "A FAPE 'consists of educational instruction specially designed to meet the unique needs

of the handicapped child, supported by such services as are necessary to permit the child to

benefit from the instruction.'" *Sumter Cnty.*, 642 F.3d at 483 (quoting *Bd. of Educ. of Hendrick

Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89 (1982) (internal quotation marks

omitted)).

To meet the IDEA's FAPE requirement, the School Board must develop and review an

IEP for each child with a disability. 20 U.S.C. § 1412(a)(4). IEPs are written statements for each

disabled child designed by a team of school district educators and administrators, education

experts, and the child's parents. *Id.* § 1414(d)(1)(A)-(B); 34 C.F.R. § 300.321(a). In developing

the IEP, the IEP team considers the strengths of the child; parental concerns; the results of testing

and other evaluations of the child; and the academic, developmental, and functional needs of the

child. 20 U.S.C. § 1414(d)(3)(A)-(d)(3)(B)(i). If a dispute arises over the sufficiency of an IEP,

the statute requires that the parents notify the school district of their complaints and enter into

3

mediation. *Id.* § 1415. If mediation is unsuccessful, the law allows the parents to bring a due process action before an administrative hearing officer. *Id.* The party aggrieved by the hearing officer's decision may file a civil action in state or federal court. *Id.* § 1415(i)(2).

A state's substantive obligations under the IDEA are "relatively limited." *Sumter Cnty.*, 642 F.3d at 484. The IDEA "does not require a perfect education." *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 328 (4th Cir. 2009); *see also* 20 U.S.C. § 1412(a)(1)(A). Indeed, the IDEA does not obligate public school to furnish "every special service necessary to maximize each disabled child's potential." *Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F. Supp. 2d 554, 562 (E.D. Va. 2009). Rather, "a FAPE must be reasonably calculated to confer *some educational benefit* on a disabled child." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 526 (4th Cir. 2002) (emphasis added). IEPs are sufficient under IDEA if they afford "the child the basic floor of opportunity that access to special education and related services provides." *Hogan*, 645 F. Supp. 2d at 562 (internal quotations omitted). Nonetheless, "Congress did not intend that a school system could discharge its duty under the [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall ex rel. Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985). The IEP must be reasonably calculated to permit the child to receive "some non-trivial educational benefit." *Sumter Cnty.*, 642 F.3d at 486.

If a public school cannot provide a FAPE in the public school system, the IDEA requires the school district to assume the cost of educating the child in a private school that meets the child's educational and social service needs. 20 U.S.C. § 1412(a)(10)(B). Parents may be reimbursed for unilateral private placement when a court or hearing officer determines: (1) a school district failed to provide a FAPE; and (2) the private placement was suitable. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009). In making its determination, courts examine

4

"all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child." *Id.* The court also has discretion to award reimbursement for "some or all of the cost of the child's private education." *Id.* Indeed, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school." *Id.*

### B. Factual Background

FCPS held S.H.'s first IEP meeting on February 15, 2005, when S.H. was in second grade. The IEP identified two needs and goals in basic reading skills and written language. The IEP also established classroom accommodations, such as preferential seating, extended time, and the opportunity to respond orally. It provided for three hours a week in a special education setting and special education services in a general education setting on an intermittent basis. The Parents agreed with the contents of the IEP.

FCPS held an IEP meeting on February 22, 2006, during S.H.'s third grade year. This IEP expanded S.H.'s needs and goals to include mathematics. Special education services were increased from three hours to nine and a half hours a week, of which two and a half hours were in a special education setting. Again, the Parents agreed to the IEP.

At that time, a Qualitative Reading Inventory ("QRI") test indicated S.H.—a third grader—read at a second grade level. Additional progress reports from April and June 2006 indicated S.H. "was making sufficient progress to achieving her goals." AR 23; AR 50.[1]

---

[1] The Court uses several abbreviations within its citations for convenience and clarity. The Court uses "TR" to refer to the administrative hearing transcript. "AD" refers to the initial Administrative Decision, while RAD refers to the Revised Administrative Decision. Finally, "AR" is shorthand for the administrative record.

5

### i.    2006-2007: Fourth Grade at Colvin Run Elementary School

In September 2006, S.H. began her fourth grade year at Colvin Run Elementary School

("Colvin Run"), S.H.'s neighborhood public elementary school. The 2006-2007 year would turn

out to be S.H.'s final year in the FCPS system. On September 14, 2006, S.H.'s IEP was formally

amended to include occupational therapy. S.H. would receive two hours a month of occupational

therapy, with one hour in a special education setting.[2] This amendment resulted from an

occupational therapy evaluation conducted by FCPS the previous summer, which identified

S.H.'s difficulties with fine motor skills. Additionally, the IEP increased S.H.'s special education

services from nine and a half to fifteen hours per week, five hours of which were provided in a

special education setting. Again, the Parents agreed to S.H.'s IEP. S.H. showed initial progress

towards achieving her IEP goals. A November 2006 progress report indicated S.H.'s progress

was sufficient to meet the identified goals.

During the winter of 2006-2007, however, S.H. began to experience significant motor

and neurological problems. She had trouble reading and difficulty speaking in the mornings. She

developed a droopy left eye, along with weakness and numbness in her right side. In addition,

S.H. developed a tremor in her right hand and switched from being right-handed to being left-

handed. Though she visited scores of physicians, including specialists at Johns Hopkins and

Children's National Medical Center, doctors did not make a conclusive finding regarding the

cause of her recent developmental disorders. S.H.'s parents and educators were not sure how best

---

[2] Whether S.H. requires self-contained special education classes is central to this dispute, so it is worth delineating what self-contained special education entails. Placement in a self-contained environment would remove S.H. from the general education setting in favor of classes with solely special education students and a special education teacher. By contrast, at points FCPS proposed placement in general education classes or in general education classes with the support of a special educator. The Parents maintain S.H. required fully self-contained special education classes, while FCPS argues a mix of general education, general education with special education support, and self-contained special education classes were sufficient to provide S.H. with non-trivial academic benefit.

6

to adapt to S.H.'s sudden onset of neurological issues. Some of S.H.'s disabilities were unaffected, while others were exacerbated or created by the onset of her neurological condition.

Meanwhile, on January 27, 2007, S.H.'s parents submitted an application to the Lab School of Washington. It was not until the spring of 2007 that S.H. received her acceptance and her parents sent Lab a deposit to hold her spot.

The Parents met with FCPS representatives on February 13, 2007, to prepare the IEP for the balance of S.H.'s fourth grade year and the beginning of fifth grade. Like its predecessor, the IEP showed needs in the areas of reading, written language, and mathematics. The IEP added goals in organization and hand use. S.H.'s special education hours remained at fifteen, but she would now spend six hours in a special education setting rather than five hours as provided by the previous IEP. The IEP team amended her IEP a week later, adding two hours of adapted physical education ("adapted PE") a month, and directing FCPS to conduct an adapted PE evaluation because of S.H.'s difficulties with balance, locomotor skills, and motor planning. The Parents again agreed to the contents of the IEP.

Throughout the year, S.H. took numerous tests to assess her progress during fourth grade. For example, in the spring of 2007, S.H. took the Virginia Standard of Learning ("SOL") exams. She passed the Virginia Studies and Reading portions, but narrowly failed the Plain English Mathematics category, missing a passing score by one question. Additionally, FCPS tested S.H. using the QRI, the Read Naturally program, the Lexia reading program, and the Gray Oral Reading Test ("GORT").

Aside from testing, S.H.'s teachers also evaluated her progress via report cards and IEP progress reports. In April 2007, her IEP progress report reflected "some progress" in reading-word recognition, reading fluency, written language, organization, hand use for class room tasks,

7

and self-advocacy in physical education. S.H. was more successful in the realm of mathematics, where she was "making sufficient progress toward achieving the goal within the duration of the IEP." AR 55. S.H.'s report cards were also indicative of educational progress. In S.H.'s final progress report for her fourth grade year at Colvin Run, she received an A in music; B's in health, mathematics, and physical education; and C's in spelling and written communication, science, and social studies. Her work habits were consistently rated as "satisfactory" or "good," but she received a rating of "needs improvement" in organizing materials. AR 52. There is also evidence that S.H. benefited socially at Colvin Run. However, S.H.'s parents testified to instances of frustration, particularly after school, and her general education teacher expressed minor concerns about S.H.'s social progress.

### ii.   2007-2008 IEP: Fifth Grade

In May and June 2007, the Parents met with the IEP team to augment S.H.'s fourth grade IEP and formally prepare her fifth grade IEP. As with the previous IEP, the fifth grade IEP provided for fifteen hours a week of special education, with six hours in a special education setting. AR 104. It also maintained levels of two additional services. S.H. would receive two hours per month of occupational therapy and two hours per month of speech language therapy. Further, the IEP identified two new areas of need in Self-Advocacy in Physical Education and Oral Communication – Intelligibility. AR 94. Rather than reject the contents of the June 2007 IEP at that time, and request enrollment at Lab at public expense, the Parents agreed to the contents of the June 2007 IEP.

On August 28, 2007, S.H. began fifth grade at the Lab School. Lab is a private K-12 school in Washington, D.C. Three hundred and fifty-five students attend Lab, all of whom have learning or related disabilities but have average to above average intelligence. Lab performed a

number of tests to gauge S.H.'s academic needs and educational level. In October 2007, she received testing using the Woodcock-Johnson III achievement test and a physical therapy evaluation. Lab's Woodcock-Johnson testing examined S.H.'s broad reading, broad math, and broad written skills. Thereafter, the Parents met with Lab School staff to develop an individual education plan to cover the remainder of S.H.'s fifth grade year and the beginning of her sixth grade year. Together, they established goals in writing, reading, math, social behavior, speech, and occupational therapy. S.H. would receive thirty-two hours and forty-five minutes of special education, one hour and a half of speech and language therapy (half in an individual setting and half with a group), and forty-five minutes of individual occupational therapy per week. All of the aforementioned services would occur in a self-contained special education setting.

On November 15, 2007, counsel for the Parents wrote FCPS to "request a meeting be convened to review [S.H.]'s IEP." AR 109. Though it may have been the Parents' intention to use the letter to signal a rejection of the operative IEP and a request for reimbursement for the costs of private placement, the letter did not say so. In order to review S.H.'s IEP, prepare a new IEP, and complete her triennial evaluation of eligibility for special education services, the Parties agreed to allow FCPS to observe S.H. at Lab and conduct updated psychological, occupational therapy, and physical therapy evaluations. FCPS staff observed S.H. at Lab in January 2008, and on January 25, 2008, FCPS found that S.H. remained eligible for special education services.

### iii.    2008-2009 IEP: Sixth Grade

The IEP team met on three occasions between February and June of 2008 to formulate S.H.'s sixth grade IEP. The IEP team maintained goals in the seven areas of need set forth in S.H.'s previous FCPS IEP. *Compare* AR 27 *with* AR 104. They included reading, writing, math, organization, and oral communication. The IEP also added five additional needs and goals,

9

including additional goals in the areas of reading, writing, and oral communication. AR 27. Her special education services were increased from fifteen to twenty-one and a half hours a week, of which seven and a half hours would be in a special education setting. S.H. would continue to receive four hours per month of adapted PE services, four hours per month of speech and language services, and one hour a week of occupational therapy—all of which would occur in the general education setting. Additionally, FCPS would provide S.H. with four weeks of extended school year services, consisting of fifteen hours a week in the areas of reading – word recognition and reading fluency. The IEP continued to recommend placement within FCPS at Colvin Run Elementary. At Colvin Run, S.H.'s special education classes would consist of four students, while her general education classes would include twenty-six or twenty-seven students.

The Parents disagreed with the IEP and placement at Colvin Run. The Parents formally rejected the proposed FCPS IEP through counsel on June 27, 2008. AR 134. The June 27 letter appeared to request public funding for S.H.'s sixth grade Lab School placement, but the first explicit request for public funding for her fifth grade placement appeared in a follow up letter sent in July 2008. AR 137. The letters detailed the Parents' basis for rejecting the IEP. In particular, the Parents took issue with FCPS's refusal to propose small, self-contained special education for all of S.H.'s academic classes.

### iv.    2009-2010 IEP: Seventh Grade

FCPS staff conducted educational, speech language, and psychological examinations of S.H., and observed her at Lab in the last summer and fall of 2009. S.H.'s IEP team met in October, November, and December 2009 to complete her seventh grade IEP. The IEP recommended placement at Longfellow Middle School ("Longfellow"), S.H.'s neighborhood public middle school. AR 28. At Longfellow, S.H. would receive twenty-two hours a week of

10

special education services, with eighteen hours in a special education setting. Eighteen hours of self-contained special education instruction represented a significant jump from her previous level of service. It more than doubled the proposed seven and a half hours under her previous IEP. Under her seventh grade IEP, S.H. would also have the majority of her courses, including English, math, science, reading, and basic skills, in self-contained special education classes. Class sizes for S.H.'s self-contained classes would vary from four to ten. The December 2009 IEP also proposed four hours a month of occupational therapy; five hours a month of speech language; and four hours per month of adapted PE. In sum, the IEP proposed thirteen needs and goals in areas ranging from reading, writing, communication, and mathematics. The Parents rejected the proposed IEP and maintained S.H. required an entirely self-contained program. They also took issue with FCPS' refusal to recommend physical therapy as an additional service.

**v.      2010-2011 IEP: Eighth Grade**

On June 18, 2010, the FCPS IEP team met to consider S.H.'s IEP for the 2010-2011 school year. AR 187. The team's proposal for eighth grade mirrored the proposed seventh grade IEP. It included twenty two hours a week of special education services, including eighteen hours in a special education setting. Like the seventh grade IEP, the eighth grade IEP proposed four hours a month of occupational therapy, five hours per month of speech language instruction, and four hours per week of adapted PE. S.H.'s English, math, science, reading, and basic skills classes would be in a self-contained special educational environment, with class sizes ranging from three to six students. Additionally, S.H. would attend a team-taught civics class, with six general education students and six special education students and a twelve-person Adapted PE class. Again, the Parents rejected the proposed FCPS IEP and asserted S.H. required an entirely self-contained special education environment.

11

### LEGAL STANDARD

Generally, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "In the IDEA context, however, a motion for summary judgment challenging an administrative ruling 'may more aptly be described . . . as a motion for summary adjudication.'" *D.B. v. Bedford Cnty. Sch. Bd.*, 708 F. Supp. 2d 564, 569 (W.D. Va. 2010) (quoting *Cone v. Randolph Cnty. Sch. Bd. of Educ.*, 657 F. Supp. 2d 667, 673 (M.D.N.C. 2009)); *see also Hogan*, 645 F. Supp. 2d at 561 (explaining that "a district court reviewing a state administrative decision under the IDEA may grant summary judgment based upon the administrative record."). In an IDEA case, "the existence of a disputed issue of material fact will not defeat a motion for summary judgment." *D.B.*, 708 F. Supp. 2d at 569. The district court considers the record of the administrative hearing as well as any new evidence offered by the parties, and makes an independent decision based on its view of the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *Hogan*, 645 F. Supp. 2d at 561. The party challenging the decision bears the burden of establishing the Hearing Officer's decision was erroneous. *Hogan*, 645 F. Supp. 2d at 567. Here, that burden falls upon the Parents.

### A. The Hearing Officer's Findings

The Hearing Officer found that the Parents did not meet their burden and the services and placement proposed by FCPS were reasonably calculated to enable S.H. to receive some educational benefit. The Hearing Officer found the June 2007 IEP, which would govern S.H.'s fifth grade year, sufficient to provide her with educational benefit. The Hearing Officer also found that the IEPs for S.H.'s sixth, seventh, and eighth grade years were similarly appropriate. Underlying the administrative decision were three findings. First, was a finding that S.H. made academic progress during her fourth grade year. Because S.H. progressed under her fourth grade

12

IEP, which provided for fewer services and accommodations than any subsequent IEP, the Hearing Officer reasoned that the successive fifth grade IEP would also offer S.H. the opportunity to make non-trivial progress. In this regard, when addressing S.H.'s social progress during her time at Colvin Run, the Hearing Officer noted he gave "less weight" to the Parents' testimony, in favor of that from FCPS staff, because the Parents did not raise any complaints with school personnel at the time. RAD at 7. Second, the Hearing Officer found that S.H.'s medical profile changed in the winter of 2007. He found her subsequent IEPs added additional services primarily to reflect her mounting physical disability. On this subject, the Hearing Officer found the testimony of Daniela Wiseman particularly credible and worthy of great weight.[3] Ms. Wiseman, a FCPS psychologist, testified that FCPS increased S.H.'s services as a result of her changing condition. In addition, Ms. Wiseman testified to the benefits S.H. would incur from education in a public school environment, which would allow her to interact with general education students.

---

[3] The Parents argue that one of the Hearing Officer's stated bases for crediting Ms. Wiseman was factually inaccurate. He stated: "In addition to being the only psychologist to testify, other than S.H.'s parents she was the only witness to have observed S.H. from the beginning of her qualification for special educational services to the time of the hearing." RAD at 20. Ms. Wiseman, however, testified that she had "not observed [S.H.] in the classroom." Wiseman TR 261. According to the Parents, this error "infect[s]" all of the Hearing Officer's findings. Pl. Supp. Mem. at 6. The Court finds otherwise for several reasons. First, though Ms. Wiseman did not observe S.H. in the classroom, she did personally evaluate her on three occasions in November/December 2004, December 2007, and August 2009. Even if the Court were to adopt the Parents' view that "observation" necessarily relates to classroom observation and not personal observation, the fact remains that Ms. Wiseman personally evaluated S.H. in the second, fourth, and seventh grades. She also testified that she "had sufficient information" to express an opinion concerning S.H.'s needs; in fact, she explained that she reviewed an immense amount of information regarding S.H.. Wiseman TR 182-83 ("I think I have the most information about a particular child, I would definitely say [that was the case] from [S.H.]"). Though the Hearing Officer's finding can be read as an overstatement or even a misstatement, it does not follow that Ms. Wiseman lacked a basis for her opinion or the Hearing Officer lacked a basis for crediting her.

Second, Ms. Wiseman's "observation" of S.H. was not the only basis the Hearing Officer provided for finding her persuasive. Indeed, it was a secondary basis, put forth "[i]n addition to" the fact that she was the "only psychologist to testify." RAD at 20. Precedent provides for deference to the hearing officer's credibility determinations even where they are implicit. *See Cnty. Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306-07 (4th Cir. 2005). Given the deferential standard provided to even implicit credibility determinations, a single factual error contained in an alternative basis for a credibility determination does not obligate the Court to ignore the Hearing Officer's explicit finding that Ms. Wiseman testified credibly.

13

Under longstanding Fourth Circuit jurisprudence, a hearing officer's findings are given

due weight and considered *prima facie* correct so long as they are regularly made. *See, e.g.*, *Z.P.*,

399 F.3d at 305. Further, the Court must give due regard to a hearing officer's judgments as to

the credibility of witnesses; even implicit credibility determinations are entitled to deference.

*Hogan*, 645 F. Supp. 2d at 561 (citations omitted). Once the Court "has given the administrative

findings due weight, it is then free to decide the case on the preponderance of the evidence." *Sch.*

*Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 936 (E.D. Va. 2010) (internal

quotations omitted).

Before reviewing the Hearing Officer's ultimate conclusions, the Court will first

determine whether the findings of the Hearing Officer were regularly made and should be

considered *prima facie* correct. Administrative decisions are regularly made so long as the

process through which the decision was made is within the accepted norms of the fact-finding

process. *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir.

2008). In *J.P.*, for instance, the Court found the administrative decision regularly made because

the hearing officer (1) allowed both parties to present evidence and make arguments; and (2)

resolved the factual questions in a normal way, "without flipping a coin, throwing a dart, or

otherwise abdicating his responsibility to decide the case." *J.P.*, 516 F.3d at 259. Neither party

questioned the process by which Mr. Towner conducted the administrative hearing. Mr. Towner

examined over 200 exhibits and heard eight days of testimony from seventeen witnesses (whose

testimony constitutes more than 2000 pages of transcript). The Court's review of the transcript

indicates Mr. Towner was engaged in the hearing process. He interrupted to seek clarification

when necessary and regularly questioned witnesses personally. Accordingly, the Court finds Mr.

Towner's decision regularly made and entitled to due weight.[4]

## ANALYSIS

The Parents maintain the Hearing Officer erred in finding the IEPs proposed by FCPS for

the 2007-2008, 2008-2009, 2009-2010, and 2010-2011 school years sufficient to provide S.H.

with a FAPE. The Parents find further error in the Hearing Officer's decision to deny

reimbursement for S.H.'s private placement for all four years in question. The Court disagrees

and finds each IEP sufficient to provide S.H. with a free and public education in the public

school environment. Because the Court finds each IEP sufficient, it will not address the propriety

of S.H.'s parental placement at Lab. *See Forest Grove*, 557 U.S. at 247 (directing courts and

hearing officers to first determine whether a school district failed to provide a FAPE and if it did

not, whether the private placement was suitable).

"Whether an IEP is appropriate is a factual question, one that IDEA charges the district

court with answering based on the preponderance of the evidence." *J.P.*, 516 F.3d. at 258-59

(citations omitted). The Court must evaluate each school year's IEP individually to determine

whether it is reasonably calculated to confer some educational benefit. *See M.S.*, 553 F.3d at 315,

324. The party challenging the Hearing Officer's decision bears the burden of proof. *See Barnett*

*ex rel. Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991). Therefore, in this

case, the burden is on the Parents to show that the IEPs proposed by FCPS were not "reasonably

calculated to confer *some educational benefit* on a disabled child." *Sumter Cnty.*, 642 F.3d at 484

(quotations omitted, emphasis added). The Fourth Circuit has not, however, provided an

organizational rubric for courts to follow when undertaking this analysis. This Court thus looks

---

[4] Of course, the Court did remand this matter to the Hearing Officer for clarification of certain issues. Nonetheless, at no point did the Court or the Parties question the process by which Mr. Towner came to his factual findings.

to the Fifth Circuit's organization of the various factors when making its assessment. These

factors include: (1) whether the proposed IEP was individualized on the basis of S.H.'s

assessment and performance; (2) whether the IEP placed S.H. in the least restrictive

environment; (3) whether the services were provided in a coordinated and collaborative manner;

and (4) whether positive academic and non-academic benefits were demonstrated. *Cypress-*

*Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 253 (5th Cir. 1997).[5]

## A. S.H.'s Fifth Grade IEP Was Reasonably Calculated to Provide Her with Some Educational Benefit

S.H.'s IEP team met in February and June 2007 to develop S.H.'s fifth grade IEP. It

included detailed goals in the areas of reading, writing, mathematics, oral communication,

organization, and hand use. AR 93, 104. S.H. would receive fifteen hours a week of special

education services, six hours of which would be in a special education setting. In addition, S.H.

would receive two hours a month of occupational therapy and two hours of speech language

therapy. Of these additional services, all but half an hour of occupation therapy would be in a

special education setting. Finally, S.H. would also receive two hours a month of adapted PE.

---

[5] These four factors track the federal regulations which implement the IDEA and case law from the Fourth Circuit and the Supreme Court. *See* 34 C.F.R. § 300.320; 300.324 (factor one: Individualized on the basis of assessment and performance); *Rowley*, 458 U.S. at 188-89 (IDEA requires schools to provide "educational instruction specially designed to meet the unique needs of the handicapped child."); 34 C.F.R. § 300.114(a)(2) (factor two: Least Restrictive Environment); *DeVries v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989) ("Mainstreaming of handicapped children into regular school programs . . . is not only a laudable goal but is also a requirement of the Act."); 34 C.F.R. § 300.321-322 (factor three: collaborative, mandating the IEP team include the parents and representatives from the school); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985) (holding that the IDEA repeatedly "emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness."); 34 C.F.R. § 300.324(b)(1)(ii) (factor four: positive academic and non-academic benefits); *MM*, 303 F.3d at 532 (concluding that in some situations, evidence of actual progress may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit).

This Court also takes its analysis of factor three a step further than the Fifth Circuit. The *Cypress-Fairbanks* court found no fault in the coordination and collaboration of key "stake-holders" in the plaintiff's services, including individual teachers, administrators, and counselors. *Cypress-Fairbanks*, 118 F.3d at 253. In addition to coordinated implementation by key stake-holders, this Court will also include evidence of collaboration in the preparation of S.H.'s IEPs. This seems to be the focus of the IDEA's implementing regulations, including those cited by *Cypress-Fairbanks*. *See* 34 C.F.R. § 300.321 (governing the members of the IEP team); *id.* § 300.322 (requiring that schools give parents the opportunity to attend and participate in each IEP team meeting).

i.   **The Fifth Grade IEP was Individually Tailored to S.H.'s Needs as They Existed at the Time**

At the time the IEP team met to construct S.H.'s fifth grade IEP, S.H.'s needs were in part a moving target. Certain ailments were novel and unexplained, while others were longstanding and unaffected by S.H.'s apparent neurological condition. In the winter of 2007, after exhibiting a range of symptoms, S.H.'s doctors found a lesion on the sensorimotor area of her brain. Doctors did not think the lesion itself was new, but its effects were novel. It appeared to affect S.H.'s motor, speech, and visual abilities. Educators, doctors, and the Parents struggled first to determine the origin of S.H.'s symptoms, and secondly, to adapt her educational services accordingly. This shared uncertainty is particularly evident in a series of emails between S.H.'s mother and her resource teacher, Ms. Leonelli. After describing S.H.'s recent difficulties, including gait, vision troubles affecting her reading and her handwriting, her switch to writing with her left hand, and drooping right eye, Mrs. Hopkins wrote: "So, who knows? But [S.H.]'s definitely feeling the effects of [the lesion] now. As eye opening as it is for me, I wonder if it will really change anything we're doing with [S.H.] right now. Do you think? Or not?" AR 92; AR 104 at 3 (noting that because S.H.'s "speech difficulties may be neurologically related and although she will be taught strategies to help [with issues such as] intelligibility[,] her overall weakness may not improve"). Despite the challenge of adapting S.H.'s services to this perplexing interplay of longstanding difficulties and novel complications, S.H.'s IEP team proposed services to ensure she continued to receive educational benefit in the public school environment.

The stream of proposals for additional services came from a variety of sources. At points, additional services were proposed by FCPS educators, not S.H.'s parents or the scores of doctors she visited that winter. This fact is telling to the Court, and indicative of the FCPS's efforts to

satisfy the IDEA and tailor services to S.H.'s individual needs. For instance, the IEP team

revised S.H.'s IEP in February 2007 to add two hours of adapted PE. The revision occurred at

the request of S.H.'s physical education teacher. FCPS evaluated S.H. for adapted PE services at

her teacher's request. The evaluation found S.H. eligible because she "could benefit" from

adapted PE and her IEP was modified to provide for two hours a month of additional services.

AR 94 at 3. The IEP also added an additional goal in the area of "Self-Advocacy in Physical

Education." *See id.* at 2 ("Due to [S.H.]'s medical condition it is difficult for her to a[c]cess the

general education [physical education] curriculum without adult generated modifications.").

Similarly, by way of a March 2007 email, Ms. Leonelli notified Mrs. Hopkins of S.H.'s

increased miscues during oral reading exercises. AR 92. S.H.'s June 2007 IEP reflected this

additional need. It added a goal in "Oral Communication – Intelligibility" and provided for two

hours of speech language therapy, both of which would occur in a self-contained special

education setting. AR 104. Again, the Court finds it notable that the additional goal was spawned

by her teacher's concern and diligence.

Despite the challenge of adapting S.H.'s educational goals to meet her evolving physical

condition, S.H.'s IEP team quickly and unanimously proposed goals to meet her needs. In so

doing, FCPS complied with IDEA's requirement that S.H.'s IEP provide for "educational

instruction specially designed to meet the unique needs of the handicapped child . . . supported

by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458

U.S. at 188-89.

### ii.   S.H.'s Fifth Grade IEP Provided For Some Educational Benefit in the Least Restrictive Environment

The IDEA requires disabled children to participate in the same activities as non-disabled

children to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). "Mainstreaming of

handicapped children into regular school programs . . . is not only a laudable goal but is also a requirement of the Act." *DeVries*, 882 F.2d at 878.[6] As noted by the Hearing Officer, the 2007-2008 IEP explicitly attempted to balance the IDEA's least restrictive environment and mainstreaming requirement with S.H.'s individual needs. The IEP "involved a combination of time for S.H. in general and special education classrooms at Colvin Run. For the majority of S.H.'s [thirty-five hour] school week, she would be supported by a special education teacher." RAD at 9. Indeed, the IEP sought to balance the benefits of the general education setting, while affording S.H. special education support during portions of her general education classes. Furthermore, the IEP provided six hours a week "in a self-contained classroom with a special education teacher and a small group of special education students in order to supplement what S.H. would learn in the general education classroom." RAD at 9; *see also* AR 104 at 3 (noting that although S.H.'s language scores were "within normal limits on standardized tests," weaknesses identified by her teachers could be taught in the general education setting "and reinforced during speech sessions in a small group setting"). Additionally, the IEP provided for three and a half hours of monthly occupational therapy and speech language therapy in a self-contained special education setting.

Under the IDEA, removal of the disabled child from the regular education environment may occur, but "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). As it stood in June 2007, however, S.H.'s disabilities were not so severe as to require removal from the regular educational environment for her to

---

[6] *See also* 34 C.F.R. § 300.114(a)(2)(i)-(ii) ("Each public agency must ensure that—to the maximum extent appropriate, children with disabilities . . . are educated with children who are nondisabled; and [s]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs *only if* the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.") (emphasis added).

achieve non-trivial educational benefit. Indeed, the June 2007 IEP—which the Parents agreed

to—noted new, but "mild" speech and language issues. AR 104 at 2. At the time, S.H's test

scores were "within normal limits" and the IEP team determined specific areas of weakness

could still be addressed "through her primary disability program in Fairfax County Public

Schools." AR 104 at 2-3.

In deciding whether the 2007-2008 IEP met the IDEA's mainstreaming requirement, the

Hearing Officer weighed contradictory testimony from Ms. Davis, the Parents' educational

consultant, and Ms. Wiseman, a FCPS psychologist, and credited Ms. Wiseman. Ms. Davis

testified that S.H. failed to make meaningful progress in the general education setting, a setting

which also exacerbated S.H.'s social and emotional vulnerabilities. Davis TR 1924-25. S.H.'s

disabilities, at least according to Ms. Davis, were severe enough to render education in the public

school environment unsatisfactory and Lab the proper and least restrictive environment in which

S.H. could experience educational benefit. By contrast, Ms. Wiseman maintained placement

within FCPS would allow S.H. to benefit educationally within the least restrictive general

education setting environment. In particular, Ms. Wiseman emphasized the benefits of small

group specialized instruction when combined with opportunities to interact with non-disabled

peers throughout the day. Ms. Wiseman noted the lasting benefits of interaction with non-

disabled peers and the support system of guidance counselors, social workers, and psychologists

available to S.H. within the FCPS system should she have difficulty interacting with her

classmates within the general education setting. Wiseman TR 283-285. In fact, beginning with

S.H.'s February 2007 IEP, self-advocacy was an identified educational goal. *Id.* TR 287-88

("Part of the IEP that's been proposed has been self-advocacy, in terms of teaching a child to

identify their strengths and weaknesses, and to be able to advocate for themselves, like if they are

having trouble understanding something, or needing accommodations, things like that."). The Hearing Officer expressly found Ms. Wiseman more credible, implicitly rejecting Mrs. Davis' testimony.

The Hearing Officer's resolution of the issue, and decision to credit Ms. Wiseman, is supported by precedent. Ms. Davis's argument that S.H. thrived in Lab's fully self-contained special education environment and therefore would not have received non-trivial educational benefit at Colvin Run was rejected in a factually similar case before the Fourth Circuit. In *A.B. v. Lawson*, the Fourth Circuit rejected the parents' contention that a child with an above-average IQ but reading and writing disabilities required private placement and a fully self-contained private school environment to receive some educational benefit. *See* 354 F.3d 315, 327 (4th Cir. 2004). The court reasoned that the proposed public school IEP, "with its integrated curriculum, was less restrictive than the wholly segregated [private school]. IDEA requires mainstreaming that [the private school] does not provide." *Id.* at 330. The court then reiterated the proper analysis when comparing proposed public education with that offered by a private school. "The issue is not whether the [Lab School] is better, or even more appropriate, but whether [FCPS] has offered an appropriate program for the Child at [Colvin Run]. . . . IDEA's FAPE standards are far more modest than to require that a child excel or thrive." *Id.*

In reaching its holding, the *Lawson* court emphasized two factors that are present here— one which guided the Hearing Officer and a second that guides this Court's review of the Hearing Officer's findings. First, the IDEA expressly recognizes that "[l]ocal educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." *Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997). In the

21

context of conflicting expert testimony regarding whether a child requires a fully self-contained private school or special education services within the least restrictive public school environment to make non-trivial educational progress, the IDEA requires "great deference to the views of the school system rather than those of even the most well-meaning parent." *Lawson*, 354 F.3d at 328; *MM*, 303 F.3d at 532 ("We have always been, and we should continue to be, reluctant to second-guess professional educators. . . . [W]e are obliged to defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides.") (internal quotations omitted).[7] Second, when reviewing administrative findings, this Court must give due regard to the Hearing Officer's judgments as to the credibility of witnesses. *Hogan*, 645 F. Supp. 2d. at 561 (citations omitted); *see also Bd. of Educ. of Montgomery Cnty. v. Hunter*, 84 F. Supp. 2d 702, 706 (D. Md. 2000) ("[F]aced with such contradictory testimony, the fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility."). "To conclude that the hearing officer erred simply because he did not accept the testimony of the [parents'] witnesses, an argument that the [parents] come[] very close to making, would render meaningless the due process rights guaranteed . . . by the IDEA." *Z.P.*, 399 F.3d at 307; *see also Lawson*, 354 F.3d at 328-29.

The Court thus concludes that the IEP team properly considered the IDEA's least restrictive environment mandate when crafting the 2007-2008 IEP. S.H. would receive non-trivial educational benefit at Colvin Run, where she would experience the benefits of general education classes with her peers, but the support of special education teachers.

---

[7] *See also Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207-08 (4th Cir. 1990) ("[O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of educational professionals. N[or] . . . should [this court] disturb an IEP simply because [it] disagree[s] with its content. . . . [O]nce educational authorities have made a professional judgment about the substantive content of a child's IEP, that judgment must be respected.").

### iii.   The IEP Team Completed S.H.'s Fifth Grade IEP in a Coordinated and Collaborative Manner

The IDEA requires IEPs "to be developed jointly" by a team including a school official qualified in special education, a general education teacher, and the child's parents. *Burlington*, 471 U.S. at 368. The IDEA repeatedly "emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness." *Id.*; *see* 34 C.F.R. § 300.321-322. It is uncontested that the IEP Team for S.H.'s 2007-2008 met the IDEA's procedural requirements. The team included both Parents and four FCPS representatives, including Sue Leonelli, S.H.'s special education teacher and the provider responsible for sharing the IEP's information with other service providers. It is also uncontroverted that the Parents agreed to the IEP. In so agreeing, Mr. Hopkins indicated that he agreed with the "contents of the IEP" and "had an opportunity to participate in the development of this IEP." AR 104 at 7.[8]

This is not the case where school educators and administrators ignored parental demands or were in any way unresponsive when developing or implementing S.H.'s IEPs. If anything, the opposite is true; there was open and frequent communication between the Parents and Ms. Leonelli. *See, e.g.*, AR 92; B. Hopkins TR 83 (Q: "How would you . . . characterize your relationship with staff at Colvin Run? Mrs. Hopkins: I thought it was pretty good. I felt like we were on friendly terms, and that we wanted the same things for [S.H.]. . . . I didn't have a problem calling them or emailing them, and they usually responded right away."); *id.* TR 127 (Q: "[D]id you find [Ms. Leonelli] to be responsive to your concerns when you had something to communicate? Mrs. Hopkins: Yeah. I really thought she was."). The IEP provided that Ms. Leonelli—whom Mrs. Hopkins found dedicated and responsive—would coordinate sharing the

---

[8] Mr. Hopkins also initialed a passage stating "[t]his proposed IEP and placement decision will allow the student to receive a free and appropriate education in the least restrictive environment." AR 104 at 7.

IEP information between S.H.'s various providers. Perhaps because of the cordial relationship the Parents maintained with Ms. Leonelli, they never expressed any doubt that the fifth grade IEP would be implemented in the same collaborative manner in which it was developed.

The Court thus finds the 2007-2008 IEP was completed in a coordinated and collaborative fashion envisioned by the IDEA.

### iv.    S.H.'s Positive Academic and Non-Academic Progress During the 2006-2007 School Year is Indicative of the 2007-2008 IEP's Propriety

Much of the briefing in this matter has concerned whether S.H. made progress during her final year at Colvin Run, under a similar IEP[9] to that proposed for 2007-2008. "Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on the child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was 'reasonably calculated to enable the child to receive educational benefits.'" *Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009) (quoting *Rowley*, 458 U.S. at 207). Thus, in assessing S.H.'s 2007-2008 IEP, the Court looks to S.H's advancement, or lack thereof, during her final year within the FCPS system. The inquiry serves two purposes. First, under *Shaffer*, S.H.'s test scores and progress during her fourth grade year provided data that the IEP team drew upon to prospectively formulate S.H.'s fifth grade IEP. *See M.S. v. Fairfax Cnty. Sch. Bd.*, No. 1:05cv1476, 2007 WL 1378545, at *12 (E.D. Va. May 8, 2007), *rev'd on other grounds*, 553 F.3d 315 (4th Cir. 2009) (looking to the IEPs governing the child's final years in public school because "they are important in placing M.S.'s educational needs and progress in context for the development of later IEPs."). Second, and more broadly, evidence of actual progress "may be relevant to a

---

[9] The 2006-2007 IEP provided for fifteen hours of special education assistance, five hours of which was in a special education setting. By comparison, the 2007-2008 IEP provided for a sixth hour of self-contained special education services and added goals in organization, hand use for classroom tasks, self-advocacy in physical education, and oral communication – intelligibility. It also added two hours of adapted PE per month, two hours of self-contained speech language therapy, and an extra half-hour of self-contained occupational therapy. AR 92, 104.

determination of whether a challenged IEP was reasonably calculated to confer some educational

benefit." *M.S.*, 553 F.3d at 327; *Lawson*, 354 F.3d at 329 (relying on evidence of the child's

educational progress in his final year in public school when the child was subsequently enrolled

in private school to find the proposed IEP would provide some educational benefit had the child

returned to public school and proceeded under the proposed IEP).

Plaintiffs maintain that while enrolled in FCPS, S.H.'s scores were static at best and, in

some cases, even declining. S.H. points primarily to one test in support of this assertion. S.H.

received testing in reading, math, and writing using the Woodcock-Johnson Test in 2004 at

Colvin Run and again in the fall of 2007. She regressed significantly in writing and reading, and

exhibited a slight deficiency in math. In contrast to this regression, the Parents argue that S.H.

improved steadily at Lab. FCPS, in turn, attacks the significance of the Woodcock-Johnson

results and points to six other assessments that are indicative of S.H.'s progress while attending

public school. The Hearing Officer concluded that "though not at grade level academically, S.H.

was nonetheless able to understand and access the fourth grade curriculum, and thus did make

educational progress during her fourth grade year." RAD at 3. The Court agrees. In aggregate,

six separate tests along with S.H.'s IEP progress reports and report cards indicate she made non-

trivial progress in 2006-2007. Though at times persuasively, Plaintiffs simply undertake to

explain away too much while pointing to thin support of their own.

Plaintiffs rely almost entirely upon a single test, administered on a single day, as evidence

of S.H.'s regression. The Woodcock-Johnson Test assessed S.H. in broad reading, broad math,

and broad written skills. S.H. was first tested using Woodcock-Johnson in 2004, before she

received any special education from FCPS. Years later, in October 2007, Lab once again

administered Woodcock-Johnson. S.H. had regressed significantly in reading and written skills,

but only slightly in math. Plaintiffs' reliance on a single test for evidence of S.H.'s regression fails for numerous reasons.

First, the passage of time between the administration of each test and change in S.H.'s circumstances make it impossible to disaggregate the data. Between 2004 and 2007, S.H. began receiving special education, her IEPs changed, her neurological condition changed, and she changed schools and advanced multiple grade-levels. When metrics that assess S.H. at the beginning and end of fourth grade exist, the Court need not focus on testing that occurred outside the relevant period. *See Fairfax Cnty Sch. Bd. v. Knight*, No. 1:05cv1472, 2006 WL 6209927, at *10 (E.D. Va. Aug. 23, 2006), *aff'd*, 261 F. App'x 606 (4th Cir. Jan. 16, 2008) (finding that when the student was not evaluated using the Woodcock-Johnson test at the beginning and the end of the relevant year, it was "impossible" to determine the progress the student made during the relevant year using Woodcock-Johnson).

Second, there is no evidence to indicate the reliability of the 2007 test. Daniela Wiseman, a FCPS psychologist whom the Hearing Officer afforded "considerable weight," testified that it is essential for the evaluator to include observations of the student's behavior within the Woodcock-Johnson report. RAD at 20. The 2007 test includes no such statement, but only a computer-generated print out of S.H.'s scores. Without an explanation, there is no evidence regarding S.H.'s motivation and behavior during the testing. The omission of any narrative is particularly significant here, where the October 2007 "evaluation was very inconsistent from all the other" testing. Wiseman TR 270-72.

Given the ample reasons to view the Woodcock-Johnson tests as irrelevant, or at a minimum questionable, the Court declines the Parents' invitation to rely upon a single test to the exclusion of numerous other indicators of S.H.'s academic progress.

To varying degrees, eight other metrics indicate S.H. made some educational progress during her fourth grade year. As found by the Hearing Officer, S.H.'s report cards, IEP reports, GORT, Read Naturally Scores, Lexia reading, Qualitative Reading Inventory, spelling, and Virginia SOL exams scores are indicative of educational progress. S.H. passed all of her classes in fourth grade, earning primarily C's, with several B's and an A. AR 52; *see Rowley*, 458 U.S. at 207 n.28 ("When the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit.").[10] Her IEP reports likewise indicated she was making "some progress" towards her goals. AR 50, 55. IEP progress reports score students on a scale from two to five,[11] with two indicating "progress has not yet been demonstrated" and five signifying "fulfillment of the goal." In February 2007, S.H. received scores of no lower than threes in seven evaluative categories, indicating she had "demonstrated some progress toward achieving" her IEP goals. AR 55.

Beyond qualitative evaluations, S.H.'s scores in numerous tests also improved. To begin, S.H. showed improvement is several tests of her reading and spelling. First, S.H.'s Qualitative Reading Inventory ("QRI") instructional levels improved. When S.H. was found eligible for special education services in 2005, her reading comprehension was at a first grade instructional level. S.H.'s reading improved one grade level from a high first/beginning second instructional level at the start of fourth grade to a third grade instructional level at the end of the year. S.H. also showed improvement in the Read Naturally program, which measures fluency. S.H. began

---

[10] *See also* Kopecky TR 1529 (Ms. Kopecky: "[S.H.]'s grades were generally average [in fourth grade]. Most of her grades in different areas were a C, which is average and means a student is performing what they are expected to perform."); TR 1194-95 ("Q: And so what does that mean, [S.H.] was getting a C in reading and had satisfactory effort [on her fourth grade report card]? A: [It means] . . . she was able to do well with the requirements for fourth grade in reading. . . . [She] pretty much showed that she was producing average work . . . .").

[11] The scale actually begins at one, but one is applicable only when the goal has not been introduced. All of S.H.'s goals had been introduced, so the Court refers to the two-five scale.

the 2005-2006 school year at 1.5, but progressed to 1.8 in the Fall of 2006, 2.5 in April 2007, and

2.6 in June 2007. A third reading program, Lexia, also showed reading improvement. The Lexia

program tracks different skills such as "segmenting words into sounds," "sound/symbol for short

vowels," "irregular first and second grade Dolch words," and "medial short vowel

discrimination." AD at 24-25. Ms. Leonelli testified that S.H. "was definitely progressing in her

ability" from September 2006 to February of 2007 as measured by the Lexia testing. Leonelli TR

1222-23. The GORT, though only administered twice during S.H.'s tenure at Colvin Run,[12] also

indicated some improvement, albeit not as clearly as her QRI and Read Naturally results.

*Compare* AR 81 *with* AR 99 (S.H. improved from the 25th to the 37th percentile in reading

comprehension and the 2nd to the 9th percentile in reading rate).[13] Lastly, S.H.'s spelling also

progressed during fourth grade. In September 2006, February 2007, and April 2007, S.H.

received developmental spelling analysis, which measures five different spelling skills. When

asked if there was improvement in the tested skills, Ms. Leonelli replied: "Definitely." Leonelli

TR 1218.

      S.H. also scored well across a number of subjects on Virginia's SOL tests. S.H. passed all

of her SOL tests in third grade, including reading, mathematics, history, social science, and

science. AR 51. In fourth grade, S.H. passed the Virginia Studies (comprised of history,

geography, civics, and economics) and Reading SOLs, but fell one question shy of passing her

---

[12] FCPS administered the GORT in December 2004 and April 2007. So like the Woodcock-Johnson, the time period between testing lessens its value as a metric. Nonetheless, unlike the Woodcock-Johnson, which was administered once at Colvin Run and once at Lab shortly after summer vacation, both GORT administrations occurred during S.H.'s time at Colvin Run.

[13] The GORT results were not entirely favorable. S.H. regressed in her reading accuracy, fluency score, and oral reading quotient. Viewed fairly, therefore, S.H. exhibited some improvement in two specific areas, but regressed in others.

mathematics SOL. Ms. Kopecky[14] testified that S.H.'s success in history, where she correctly answered fourteen of fifteen questions, was particularly significant evidence of her progress during fourth grade. History "was a new skill that she had only done that school year, it's something where we can look at and say that she really did make good progress in that area." Kopecky TR 1530. Moreover, according to Ms. Kopecky, history was a particularly meaningful metric because it requires the integration of reading, writing, and memorization. Success in an interdisciplinary area, which was first introduced to S.H. that school year, led Ms. Kopecky to conclude "S.H. definitely made progress during the fourth grade year." *Id.* TR 1531.

With the benefit of hindsight and sophisticated counsel, each test can be critiqued. S.H.'s results are not perfectly uniform indications of progress, but viewed in totality, the weight of the evidence supports the Hearing Officer's finding that S.H. made some educational progress during fourth grade at Colvin Run.

The Parties disagree, at times vehemently, regarding S.H.'s non-academic progress at Colvin Run. Defendant describes S.H. as a happy and active participant in class, who got along with her peers and even assisted them. The Parents respond that S.H. lost friends, became a loner, and was stressed due to academic difficulties. The Hearing Officer sided with the Defendant and credited contemporaneous documents and the accounts provided by FCPS staff. *See* RAD at 7 ("[B]ecause the parents did not raise any complaints [regarding S.H.'s social progress] with FCPS personnel at the time, the Hearing Officer gave less weight to the parents' testimony at the hearing and discounted those adverse comments cited and accepted the version presented by FCPS staff."). The Court will not disturb the Hearing Officer's credibility determination in this regard. The Hearing Officer's resolution of conflicting testimony finds support in the record. The evidence seems best summed up by Mrs. Hopkins, within S.H.'s

---

[14] Ms. Kopecky was S.H.'s fourth grade general education teacher.

application to Lab in January 2007. Mrs. Hopkins noted that she and her husband watch S.H. "closely for any signs of frustration or lack of spirit. But [w]e have not seen any recurring evidence of [frustration]." AR 91. Overall, as the Hearing Officer found, S.H. was happy and enthusiastic about school.[15] Though there may have been instances of frustration on S.H.'s part and isolated concerns on the part of her Parents, apprehension about S.H.'s non-academic progress remained discrete.[16] Mrs. Hopkins noted no "recurring" frustration and did not mention social concerns to Mrs. Leonelli within their extensive email chain in the winter and spring of 2007. AR 91; *see* AR 92. In total, there is insufficient evidence that S.H. regressed socially during her fourth grade year at Colvin Run. Indeed, it appeared S.H. was a happy and active classroom participant.

Viewed in concert, the record shows S.H. academically and socially progressed during her final year in the FCPS system. This factor, like the Court's analysis of the coordinated and collaborative completion of the fifth grade IEP, its individual tailoring to S.H.'s needs for

---

[15] *See, e.g.*, Leonelli TR 1170-71 ("Q: Did [S.H.] mind or did she indicate whether she minded coming to your special education class when she came for reading or other activities? A: No, I don't think she minded. I mean, she never shared with me that she was unhappy . . . . She actually enjoyed it."); Leonelli TR 1177-78 ("She seemed very happy in school. She loved to participate in and share stories. As far as the classroom, the general education and in the self-contained, she raised her hand a lot."); Kopecky TR 1513 ("[S.H.] was great. She was always a happy kid. She had a smile on her face. She loved interacting with classmates.").

[16] The Parents also pointed to an evaluation of S.H. that Ms. Kopecky signed as part of S.H.'s application to Lab. The assessment referenced some of S.H.'s nervous habits and times when S.H. appeared anxious or exhibited other seemingly negative social behavior such as resenting correction. *See* AR 91. However, Ms. Kopecky provided explanation for why her comments need not be cast in such a negative light during her testimony. *See* Kopecky TR 1518-23 (for instance, though Ms. Kopecky described S.H. as a loner, she explained her choice of words during her testimony: "[S.H.] was a loner when she worked. She wanted to be able to do it by herself. She didn't want help. It's not a loner in peer relationships as much as, you know, in terms of social relationships."); *see also id.* at 1520 (when asked if S.H. became more anxious during fourth grade, Ms. Kopecky said she did not, but that S.H. became anxious towards the end of the year about attending Lab because it required "leaving her siblings at Colvin Run and going to a different school."). The Hearing Officer reasonably credited Ms. Kopecky's explanation of her comments and gave little weight to these isolated and explained critiques, when the assessment itself and Ms. Kopecky's testimony painted a far more positive view of S.H.'s social life at Colvin Run. *See* AR 91 (within the same assessment, Ms. Kopecky wrote: S.H. "gets along with peers," is "very tolerant," is a "good listener" and "wants to achieve."); Kopecky TR 1514 ("She volunteered to read out loud during class even though that was something that was a struggle for her. She still felt confident enough to try it and was happy participating in discussions.").

services within the least restrictive environment, supports the Court's conclusion that S.H. would receive some educational benefit under the fifth grade IEP.

    v.    **Even Were the Court to Conclude FCPS Failed to Provide S.H. a FAPE for the 2007-2008 Year, Equity Would Bar Reimbursement for the Costs of Private Placement for S.H.'s Fifth Grade Year**

If the Court concluded that the proposed placement at Colvin Run violated IDEA and private placement at the Lab School was proper under the Act, the Court would exercise its equitable discretion to deny reimbursement for S.H.'s tuition at Lab for her fifth grade year. Reimbursement under the IDEA is discretionary. Courts "may" require reimbursement for the cost of private placement. 20 U.S.C. § 1412(a)(10)(C)(ii); *D.B.*, 708 F. Supp. 2d at 590-91 (noting courts have inherent discretion to grant, reduce, or deny reimbursement).

In addition to the inherently discretionary nature of reimbursement, the statute carves out supplemental discretion to reduce or deny reimbursement in certain scenarios. Namely, the IDEA provides discretion to reduce or deny reimbursement in the event the Parents failed to notify the IEP team of their intent to enroll their child in a private school at public expense at the most recent IEP meeting prior to removal of the child from public school. 20 U.S.C. § 1412(a)(10)(C)(iii). Likewise, the Court may deny reimbursement if the Parents failed to provide the school district with written notice of their intent to enroll their child in a private school at public expense within ten business days prior to the removal of the child from public school. 20 U.S.C. § 1412(a)(1)(C)(iii)(I)(bb); *see also Forest Grove*, 557 U.S. at 247 ("[C]ourts retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school."). Both an exercise of the Court's inherent discretion and its

31

discretion for failure to provide notice at the most recent IEP meeting or within ten business days prior to removal are appropriate here.

The Hearing Officer did not reach the issue of reimbursement, but Defendant renews its assertion that the Parents' claim for reimbursement of 2007-2008 tuition is equitably barred. The Court agrees. The Parents did not inform FCPS of their intent to enroll S.H. at Lab at public expense until after S.H. completed the entire 2007-2008 school year at Lab.[17] Furthermore, at no point during the June 2007 IEP meeting did the Parents (1) request placement at Lab, (2) request placement at Lab at public expense, or (3) reject the June 2007 IEP and its proposed public placement.[18] In fact, the written record of the June 2007 IEP meeting makes no mention of Lab whatsoever.[19] It was not until November 2007 that the Parents retained counsel, who then contacted the school. However, even this contact did not reject the June 2007 IEP or request private placement at public expense, nor, for that matter, did it provide written notice of such a request. *See* AR 109 (requesting "an IEP meeting be convened to review [S.H.'s] IEP."). It was

---

[17] The Parents did, of course, notify Ms. Leonelli that S.H. would "most likely" attend Lab for fifth grade. AR 92 at 5 (March 28, 2007 e-mail from Mrs. Hopkins to Ms. Leonelli). But such a notification is insufficient. It did not advise FCPS with any certainty that S.H. would even be leaving Colvin Run. Nor is it tantamount to a request for private placement at public expense.

[18] *See* Leonelli TR 1189 ("Q: At that [June 2007] IEP meeting was there any criticism from either Mr. or Mrs. Hopkins concerning what the IEP team, the school system members of the IEP team[,] were suggesting for [S.H.] as either an IEP or her placement for her fifth grade year? A: No. Q: Do you remember either of the parents saying at any point during the meeting that they disagreed with the IEP? A: No. Q: Did you hear either of them saying that they didn't think what was in the IEP was enough services for [S.H.]? A: No. Q: Or that they didn't think that that was appropriate for [S.H.]? A: No.").

[19] The Parents now maintain that the June 2007 IEP was signed as "backup," in case S.H. ever sought to return to FCPS. It also seems possible that the Parents had not yet decided whether to send S.H. to Lab at the time of the June 13 meeting. *See* AR 92 (May 25, 2007, e-mail from Mrs. Hopkins to Ms. Leonelli, explaining S.H. would like to participate in a Fairfax County assistive technology program that August because S.H. "is likely to use some of the same technology whether she's in public school or the Lab School."). Regardless, *why* the Parents signed the June 2007 IEP is not the issue. It remains undisputed that the Parents did not request placement at the Lab School at public expense at that meeting. *See* B. Hopkins TR 167 (Hearing Officer: "Now, did you tell the people at the IEP meeting on June 13, '07 that you intended to enroll her in private school at public expense? Mrs. Hopkins: We did not say it in that way."); *id.* TR 161-164 (Hearing Officer: Now, did you or your husband inform the IEP team that you were rejecting the placement proposed by them? Mrs. Hopkins: I don't remember saying it that way. We didn't say, I reject the services that you are offering us, or we reject this plan because it's not adequate . . . . It was an unspoken, I guess, kind of rejection.").

not until July 23, 2008, that the Parents first provided written notice of their request for funding

of S.H.'s placement at Lab for the 2007-2008 school year. AR 137.[20] The Court thus finds the

Parents' unilateral decision to change S.H.'s placement occurred "at their own financial risk."

*Forest Grove*, 557 U.S. at 247. Equity would prevent the Court from awarding reimbursement in

this scenario, where the school had no notice of the Parents' intent to seek private placement or

reimbursement for that private placement until more than a year after the final IEP meeting, prior

to S.H.'s removal from public school.

**B. S.H.'s Sixth Grade IEP was Reasonably Calculated to Provide S.H. with Some Educational Benefit**

   **i.     The Sixth Grade IEP was Individually Tailored to S.H.'s Needs**

S.H. would continue to attend Colvin Run under the sixth grade IEP. Some additional

background helps to frame the Court's analysis of the 2008-2009 IEP. As the IEP team met to

revise S.H.'s IEP for sixth grade, the origin and effects of S.H.'s neurological condition

remained unsolved. In February and June of 2008, when the IEP team met to consider S.H.'s

sixth grade IEP, S.H. made six visits to physicians at Johns Hopkins and the Kennedy Krieger

Institute. S.H.'s "still unclear neurological condition," which impacted her "visual motor and

motor functioning" led to two schools of thought. AR 134 (Letter from Plaintiffs' Counsel to

FCPS). The Parents pushed for more services, which could be scaled back if proven unnecessary.

*See id.* (Letter from Plaintiffs' Counsel to FCBE, requesting a "conservative, common sense

response of providing more service and support. If in the end, [S.H.'s neurological condition] is

---

[20] The Parents wrote to FCPS on June 27, 2008 to "reject[] . . . the proposed IEP and placement" and to notify FCPS of their intent "to seek funding by FCPS of [S.H.'s] ongoing placement at The Lab School." AR 134. The letter provided additional reports for FCPS's consideration. FCPS responded with a letter on July 2, 2008, which the Parents responded to on July 28, 2008. It was this July 2008 letter that constituted the "formal rejection" of FCPS's June 2008 IEP and, for the first time, expresses the Parents' intent "to seek public funding for that placement [at the Lab School] for both the 2007-2008 and 2008-2009 school years." AR 137. Though the June letter could be considered the formal rejection of the June 2008 IEP, it is the first formal request for public funding for her 2007-2008 school year at Lab.

not as great a factor as it appears to be, we can always phase out services and support . . . ."). The school, by contrast, proposed incremental modifications individually tailored to S.H.'s needs as identified by educational testing or observation from S.H.'s teachers, doctors, and Parents.

Though admirable for their advocacy on behalf of their child, the Parents asked more of FCPS than the IDEA's limited mandate requires. The IDEA's requirements are "modest" and require deference to educators so long as an IEP provides the "basic floor of opportunity." *Lawson*, 354 F.3d at 330; *MM*, 303 F.3d at 532. The IDEA requires individual tailoring of educational services to address S.H.'s needs as they existed at the time. *See Schaffer*, 554 F.3d at 476-77 ("Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward."). The prospective IEP analysis permits addendums and incremental change, which allows IEP teams to adjust services. There is not, however, a requirement that schools overprovide in the hope that services can be incrementally reduced as the Parents requested.

Though S.H.'s neurological condition remained uncertain, many of her educational needs remained the same. S.H.'s struggles in reading and writing continued, as did her need for additional services in occupational therapy, speech language therapy, and adapted PE. S.H.'s 2008-2009 IEP proposed goals tailored to S.H.'s individual needs. The IEP governing the 2008-2009 year provided annual goals in eleven areas, such as reading, writing, mathematics, organization, and self-advocacy.[21] In total, S.H. would receive twenty-one and a half hours per week of special education services, with seven and a half hours in a special education setting. AR 27. It also included four hours per month of adapted PE and four hours per month of speech

---

[21] Specifically, the IEP proposed annual goals in Reading – Word Recognition; Reading – Fluency; Reading – Comprehension; Mathematics – Word Problems; Self-Advocacy in Physical Education; Language – Oral Narration; Written Language; Language – Word Retrieval; and two goals in written expression.

language therapy, along with one hour per week of occupational therapy. The 2008-2009 IEP represents a significant increase in services when compared to the 2007-2008 IEP. Her special education services increased from fifteen to twenty-one and a half hours per week, occupational therapy jumped from one and a half to four hours per month, and speech language services doubled from two to four hours per month.

Though the Parents were unsatisfied without private placement and a fully self-contained special education environment, the 2008-2009 IEP was tailored to many of their requests and echoed the advice of S.H.'s doctors. The IEP indicates the "team is in agreement" that S.H. "requires phonological & phonemic awareness in order to make progress in reading decoding." AR 27 at 22. Accordingly, the IEP proposed a detailed goal in Reading – Word Recognition, including a supplemental reading program. The IEP team also considered representations made by the Parents and Lab teachers that the legibility of S.H.'s handwriting had declined. Consequently, the IEP proposed a goal in writing and included a classroom accommodation that S.H. could use a keyboard.

The IEP also implemented a number of recommendations offered by S.H.'s neurologist. For instance, S.H.'s neurologist made a number of recommendations for services that would be helpful in assisting S.H.'s coping with difficulties relating to her neurological degeneration. AR 120. Broadly, Dr. Jordan noted the possibility that S.H. may have difficulty with organization, multi-step tasks, and motor skills such as speech. Accordingly, Dr. Jordan proposed a number of interventions that may help S.H. For example, Dr. Jordan proposed preferential seating, small classes, and assistance with organizational skills. Additionally, Dr. Jordan opined that S.H. could benefit from occupational and speech therapies. The proposed 2008-2009 IEP specifically provided for a number of Dr. Jordan's recommendations. The sixth grade IEP included goals

such as Organization and Mathematics – Word Problems, which tailored to S.H.'s needs. Her

math goal specifically addressed and provided strategies for "multi-step math problems." AR 27

at 15. The IEP also provided S.H. with tools and accommodations to understand multi-step

problems and augment her organizational skills. S.H. would be provided with an assignment

notebook, multiple accommodations to help her understand and follow directions, and

preferential seating in areas of the classroom with minimal distractions. *Id.* at 20. Moreover, as

recommended by Dr. Jordan, S.H. would receive occupational and speech therapies for a total of

eight hours per month—a three-fold increase in services from her prior IEP.

Though the Parents and school continued to disagree about S.H.'s placement and the

proposed IEP did not replicate every parental wish and desire,[22] a careful analysis indicates the

IEP was nonetheless individually tailored to meet concerns advanced by the Parents, Lab

teachers, and even replicated many of the accommodations recommended by S.H.'s neurologist.

In such a circumstance, the evidence indicates the sixth grade IEP was individually tailored to

S.H.'s needs.

ii.      **S.H.'s Sixth Grade IEP Provided For Some Educational Benefit in the Least
         Restrictive Environment**

The sixth grade IEP, like its predecessor, proposed placement at Colvin Run. The IEP

team considered a range of placement options including general education classes, special

classes, and private day school placement. The IEP found that S.H. requires the support of

special education services to access the general education curriculum, but does not require

private placement. The Parents disagreed, maintaining that S.H. required a self-contained private

day program.

---

[22] "Although the IDEA guarantees a free appropriate education, it does not, however, provide that this education will
be designed according to the parent's desires. . . . Thus, proof that loving parents can craft a better program than a
state offers does not, alone, entitle them to prevail under the Act." *Shaw v. Dist. of Columbia*, 238 F. Supp. 2d 127,
139 (D.D.C. 2002) (quotations omitted).

At Colvin Run, S.H. would receive a mix of education in the general education setting with and without special education support, along with seven and a half hours a week of self-contained special education instruction. In proposing such a mix, FCPS sought to allow S.H. to interact with her peers while also providing for accommodations and reinforcement of her general education curriculum in the self-contained special education setting. In addition to self-contained special education for seven and a half hours per week, S.H. would receive accommodations such as a flexible schedule, preferential seating, assistive technology, shortened instructions to her assignments (which would be read to her), along with the opportunity to respond orally (as opposed to in writing) to her assignments. This combination of general education classes with and without assistance and self-contained special education class would fulfill the IDEA's least restrictive environment requirements.

### iii. The IEP Team Completed S.H.'s Sixth Grade IEP in a Coordinated and Collaborative Manner

As with S.H.'s previous IEPs, there is no question that her 2008-2009 IEP was completed in a coordinated and collaborative manner. Although S.H. attended Lab while her FCPS IEP prepared her sixth grade IEP, multiple FCPS staff members, including an occupational therapist, physical therapist, and special education teacher observed S.H. at Lab.

S.H.'s IEP team met in February and June 2008 to develop her sixth grade IEP. Both meetings were rescheduled on multiple occasions to ensure all interested parties could attend. The IEP meetings themselves were attended by one or both Parents, their education consultant and counsel, along with numerous FCPS representatives. There is no evidence or contention from the Parents that the IEP was not developed in a coordinated and collaborative manner. *See Doyle v. Arlington Cnty. Sch. Bd.*, 806 F. Supp. 1253, 1254 (E.D. Va. 1992) (finding school district's IEP appropriate where public school staff "had studied the evaluation reports, talked

37

with the parents and with [Lab] staff, formally tested [the student] during several sessions, and observed her at [Lab] several times"), *aff'd*, 39 F.3d 1176 (4th Cir. 1994). Nor do the Parents have any gripe with the proposed implementation of the sixth grade IEP. The IEP designated a specific teacher to coordinate and share the information in the IEP with S.H.'s various service providers. And, once again, that service provider would be Ms. Leonelli, whom the Parents testified was responsive and had the best interests of S.H. in mind.

      iv.     **S.H. Would Benefit Academically and Non-Academically From the Proposed IEP**

The evidence indicates S.H. would receive non-trivial benefit from the proposed IEP. As previously noted, the proposed IEP addressed S.H.'s longstanding areas of need and tailored services to address her evolving neurological condition. As recognized by the Hearing Officer, the special education services and goals proposed by Lab were, in large part, similar to those proposed by FCPS. The IDEA does not require an IEP to replicate the benefits of a private school program. *See Lawson*, 354 F.3d at 328. To be sure, its requirements are more modest. The IDEA does not require an IEP that would allow a disabled child to "excel or thrive." *Id.* at 330. Rather, the IDEA is satisfied when the state provides "personalized instruction with sufficient support services to permit the handicapped child to benefit educationally from the instruction." *Rowley*, 458 U.S. at 203. With this standard in mind, the Hearing Officer found that although the IEP need not replicate the benefits of private education, in some instances, the FCPS IEP mirrored Lab's program. Both provided for additional speech language and occupational therapy services, and both contained goals in the areas of reading, written language, and mathematics. *Compare* AR 27 *with* AR 125. With the core areas of reading, math, written language, and communications, S.H. would receive assistance in a small four-student self-contained special education class for seven and a half hours a week. Furthermore, the proposed additional services

38

were similar in substance and scope. S.H. would receive nearly the same amount of speech/language therapy and occupational therapy at Colvin Run as provide for by Lab.[23]

The sixth grade IEP was therefore sufficient to afford S.H. some educational benefit. It was individually tailored, completed in collaborative fashion, provided for S.H.'s education in the least restrictive environment, with accommodations and services that were influenced by her Parents' and doctor's recommendations, and was similar to those recommended by the Lab.

## C. S.H.'s Seventh Grade IEP was Reasonably Calculated to Provide S.H. with Some Educational Benefit

### i.     The Seventh Grade IEP was Individually Tailored to S.H.'s Needs

S.H.'s 2009-2010 IEP provided for placement at Longfellow Middle School. The seventh grade IEP proposed additional services, added goals, and markedly increased the amount of time S.H. would spend in a special education setting as she entered middle school. Though many of S.H.'s needs remained the same, the IEP team agreed that S.H.'s articulation/intelligibility deteriorated over the past year. S.H.'s poor balance and weakness continued; evaluations by doctors at Johns Hopkins also continued. According to the Parents, her physical condition had worsened to such a degree that S.H. required physical therapy to access the educational curriculum. FCPS disagreed; the school did not recommend physical therapy services, but agreed to a consultation.

Under her seventh grade IEP, S.H. would receive twenty-two hours a week of special education services, with eighteen hours a week in a special education setting. Though her services remained relatively constant, the amount of hours she would receive in a special

---

[23] At Lab, S.H would receive one and a half hours per week of speech language therapy and one and a half hours per week of occupational therapy. At Colvin Run, S.H. would receive an hour per week of occupational therapy and an hour per week of speech language therapy. In terms of additional speech language and occupational therapy services, therefore, S.H. would only receive an hour more per week under the Lab IEP as compared to the IEP proposed by FCPS.

education setting more than doubled from seven and a half to eighteen hours. S.H.'s related services were also increased. S.H. would continue to receive four hours a month of occupational therapy and four hours a month of adapted PE, but would receive one additional monthly hour of speech language therapy. The IEP proposed fifteen different goals, including three reading goals, articulation, intelligibility, two word retrieval goals, math, adapted PE, and self-advocacy. AR 28.[24]

The comprehensive goals proposed for S.H.'s seventh grade year were tailored to her individual needs as she entered middle school. Middle school provides a unique set of challenges to students. Its content is "extremely challenging," and the educators believed S.H. would require "additional support to be successful." Essmen TR 1003; Wiseman TR 292 (explaining the curricular demands in middle school "are a lot greater"). The IEP team proposed an IEP, keeping in mind the challenges of middle school and S.H.'s evolving needs in some areas, but static needs in others. For instance, decoding and word recognition remained an issue for S.H., and it affected her ability to complete reading assignments. A goal in Reading – Word Recognition and Phonemic Awareness drew upon the results of testing from the Lab School and a psychology report to propose specific goals to address areas where she tested below average. *See* Smith[25] TR 1402-03 ("[W]e kept making ongoing changes as we gathered more information. [For instance,] . . . we revised the decoding goal to include phonemic awareness," which is how S.H. sounds out words). The IEP also addressed S.H.'s speech and intelligibility, areas which the IEP team

---

[24] S.H.'s goals included: Reading – Fluency; Reading – Comprehension; Reading – Word Recognition & Phonemic Awareness; Articulation; Intelligibility; Word Retrieval (to retrieve specific words across content areas); Word Retrieval (to recall information related to the curriculum); Written Expression (write assignments to be scored based on ideas, organization, voice, word choice, fluency, and mechanics); Written Expression (independently complete assignments within the allotted time, with decreasing key strike, copy, and editing omissions); Written Expression (to legibly sign her name and write numbers within a designated space); Functional Performance; Math – calculation, fluency, word problems; Adapted PE; Self-Advocacy.

[25] Ms. Smith is Longfellow Middle School's Special Education Department Chair.

agreed S.H. had regressed. To address this regression, the 2009-2010 IEP proposed new goals in Articulation and Intelligibility. AR 28 at 12-13.

Once again, the Parents rejected the proposed IEP due to their belief that S.H. required entirely self-contained special education classes. For its part, FCPS believed S.H. would receive the needed special education support and accommodations at Longfellow, where she would also benefit from an integrated setting.

### ii.      S.H.'s Seventh Grade IEP Provided For Some Educational Benefit in the Least Restrictive Environment

In seventh grade, S.H. would transition from Colvin Run to Longfellow Middle School. Seventh graders at Longfellow take four core classes, two electives, and physical education. S.H.'s core classes in English, math, and science would be in a self-contained special education setting. Her final core class, reading, and her basic skills elective would be with a special education teacher. Her final elective, social studies, would be team-taught by one general education and one special education teacher. Finally, S.H.'s physical education class would be in a self-contained special education setting.

In particular, S.H.'s teachers felt she would benefit from a team-taught social studies class, which would allow her to interact with her general education peers. Twenty-two to twenty-four social studies students would receive instruction from two teachers, one special education teacher and one general education teacher. Though Longfellow offered social studies in a fully self-contained setting, her teachers thought she would benefit from team-teaching and interaction with her peers.

> We made that recommendation because we believed that [S.H.] would benefit. [S.H.] is very social, and has a lot of great skills, and would benefit from a class with nondisabled peers. And in a setting where she could continue to receive special education support. The social studies tends to be kind of project oriented, and she typically does well with that type of, those types of activities. So we

believed that [the team taught class] would provide the least restrictive environment for her.

Essman TR 1002. In addition to their contention that S.H. required a fully self-contained environment for all of her classes, the Parents also expressed some concerns about S.H.'s ability to navigate Longfellow. Their concerns did not sway the Hearing Officer as despite Longfellow's larger size, all of S.H.'s classes would be in the same building, and she would be eligible for numerous accommodations. For instance, S.H. would have access to two copies of her books, so she would not have to lug books to school or from class to class. She could also be let out of class a few minutes early to ensure she navigated the halls when they were un-crowded. FCPS teachers and administrators also discussed other accommodations, such as the use of the elevator and a peer buddy to walk with S.H. [26] In lieu of providing all of the numerous available accommodations, the 2009-2010 IEP rightly sought to balance S.H.'s education needs with the IDEA's requirement that, to the extent possible, her education occur in the same environment as her general education peers.

###   iii.    The IEP Team Completed S.H.'s Seventh Grade IEP in a Coordinated and Collaborative Manner

Like her previous IEPs, the seventh grade IEP met the IDEA's coordination and collaboration standards in both its planning and proposed implementation. To begin, although S.H. no longer attended Colvin Run, FCPS teachers, including an occupational therapist, two special education teachers, and a physical therapist observed S.H. at Lab. Recent testing done by FCPS in the summer of 2009 and various assessments from the Lab School also provided up-to-date information about S.H.'s abilities and needs. The IEP meetings themselves were also

---

[26] Relatedly, at points, the Parents also expressed additional concerns about S.H.'s ability to navigate Longfellow because it was undergoing renovations. The Hearing Officer, at least implicitly, credited Ms. Essman and other educators in this regard. Ms. Essman explained that the renovations were "not cluttering up the hallways," so students continued to have "easy access" to their classrooms. Essman TR 1015.

attended by the Parents, their counsel, their educational expert, and representatives from the Lab

School, in addition to FCPS representatives from both Colvin Run and Longfellow. As had been

the case previously, S.H.'s special education teachers would retain responsibility for sharing the

IEP's information with all of S.H.'s service members to include S.H.'s special and general

education teachers, and speech language and occupational therapists.

### iv.    S.H. Would Benefit Academically and Non-Academically From the Proposed IEP

The available evidence supports the Hearing Officer's finding that S.H. would receive

non-trivial benefit from the proposed IEP. To begin, there is ample evidence that the IEP team

went to great lengths to tailor the IEP to S.H.'s needs. To a greater degree than its predecessor,

the seventh grade IEP provided for similar services to those provided by the Lab School and

championed by the Parents. Indeed, the FCPS IEP is similar to the Lab IEP in class size and the

amount of additional services.[27] S.H.'s math, science, English, reading, and basic skills classes

would contain four to twelve students, taught by a special education teacher.[28] S.H. would also

attend a team-taught social studies class with two teachers and twenty-two to twenty-four

students. By comparison, at the Lab School, S.H.'s classes ranged from six students in reading,

English, and math to eight students in science, history, and social studies classes, and eight to

ten students in computer lab. Though FCPS need not replicate the class size of a lauded private

---

[27] Particularly in their supplemental briefing, the Parents argue that the issue in this case is not whether S.H. should receive additional services, but what level of services S.H. required. The Parents argue that the Hearing Officer neglected this issue by comparing factors such as the class sizes proposed by FCPS and Lab. The Court, however, agrees with the Hearing Officer's determination that comparing class sizes is directly relevant. Throughout the proceedings, the Parents' central objection to the FCPS IEPs has been their supposed failure to provide S.H. with personalized small-scale instruction. Class size is a relevant metric to assess the Parents' objection to the level of small-scale instruction afforded by the IEPs. FCPS responds that, particularly for the seventh and eighth grades, their proposed IEPs provided for highly individualized instruction in small classes. As a point of reference, FCPS maintains that its class sizes compare favorably to class sizes at Lab, a private school with a program the Parents have described as ideal for S.H. In such a circumstance, the Court finds class size a highly relevant metric, which was understandably persuasive to the Hearing Officer.

[28] At points, some of her teachers would also be assisted by an instructional assistant.

school, it came close. The similarities between FCPS and Lab continue beyond mere class size. At Longfellow, S.H. would receive two hours and fifteen minutes a week of speech language and occupational therapies. At Lab, by contrast, S.H. would receive three hours of the same additional services. Simply put, this is not the case where the public school ignored areas of need or proposed vastly different programs—quite the contrary, S.H. would take similar classes, with similar class sizes, while receiving a similar amount of additional services at Longfellow.

One significant exception to the similarities between the Lab IEP and that proposed by FCPS is in the area of physical therapy. While the Lab School's physical therapist felt S.H. required more assistance than adapted PE could provide, FCPS' physical therapist found S.H. could function independently at Longfellow and access the curriculum without publically provided physical therapy. Jane Fragola, a FCPS physical therapist and the only expert witness in the area of physical therapy, explained her opinion and no witness testified to the contrary. Based upon her evaluation of S.H. and review of various records, Ms. Fragola explained why S.H. did not require physical therapy to access the public school curriculum, despite the Parents' argument to the contrary. "What school-based therapy looks at is if a student can access their education environment, if they are safe in their educational environment and able to function independently. And [S.H.]. can. . . . she's functioning independently and I felt she was safe in her educational environment." Fagola TR 1586, 1597.[29] The Hearing Officer credited Ms. Fagola's opinion, which she supported with evidence from her observation. For example, contrary to the Parents' worries about S.H.'s ability to navigate the stairs at Longfellow, Ms. Fagola observed S.H. carrying books, keeping pace while walking with her peers, and traversing stairs. Indeed, S.H. told Ms. Fagola that she not only had no trouble with stairs, but that going up and down

---

[29] *See also id.* at 1586-87 ("Q: So is [physical therapy] necessary for [S.H.] to participate in education? A: No.").

stairs was "one of her favorite things to do." *Id.* at 1591. Though Ms. Fagola found FCPS physical therapy unwarranted at the time, she did make clear that a physical therapy consultation would be available. The consult would allow for any member of the IEP team to ask a physical therapist to observe S.H. in any area where she was having difficulties. If warranted, S.H.'s IEPs could then be adapted accordingly.

It is the Parents' burden to show S.H. would not have received some educational benefit from the proposed IEP. Where, as here, the IEP was individually tailored to S.H.'s needs, crafted collaboratively for collective implementation, and nearly replicated the services and class sizes offered by a private institution, the Court finds the Hearing Officer rightly concluded the seventh grade IEP was sufficient under the IDEA.

### D. S.H.'s Eighth Grade IEP was Reasonably Calculated to Provide S.H. with Some Educational Benefit

S.H.'s eighth grade IEP mirrored her seventh grade IEP.[30] Like the seventh grade IEP, it provided for twenty-two hours a week of special education, of which eighteen hours would be in a special education setting. It also provided for four hours of occupational therapy, five hours of speech language therapy, and four hours of adapted PE per month, and included the same fifteen goals as its predecessor. Once again, S.H. would attend Longfellow, where she could interact with nondisabled peers. And again, the IEP was formulated collaboratively for implementation by general educators, special educators, and therapists. Though much is the same, one difference is worth noting. Eighth grade involved different courses, and due to the mounting rigor as S.H. progressed to her final year of middle school, she would benefit from even smaller classes than

---

[30] Because the eighth grade IEP provides for identical services as the seventh grade IEP, the Court will not duplicate its analysis entirely. Rather, the Court adopts its analysis of the seventh grade IEP but takes time to highlight a few differences in the proposed eighth grade IEP that weigh in favor of the Court's conclusion that it was reasonably calculated to provide S.H. with some educational benefit.

her previous IEP. In fact, some classes under the proposed IEP would have been smaller than S.H.'s classes at the Lab School.

None of S.H.'s eighth grade classes would exceed twelve students. Her core classes, English, reading, math, and science, would contain three to four students. Her elective basic skills class would have six students. Her second elective—civics—would be in a class of twelve; but like her team-taught social studies class in seventh grade, there would be two teachers, one general educator and one special educator. Finally, her physical education class of twelve would be subdivided into smaller groups. S.H. would be placed in the group of more independent, higher functioning students. At Lab, S.H.'s reading, English, math, and science classes would all be larger classes with six to eight students. In other words, in S.H.'s core areas of need, the eighth grade IEP proposed classes half the size of those she would attend at the private Lab School. In lieu of her six-student basic skills elective, and team-taught twelve student civics class, S.H. would attend history and social studies classes with eight students, and computer lab with eight to ten students. Finally, instead of her subdivided twelve person physical education class, S.H.'s Lab School P.E. would contain twenty-two students. As was the Hearing Officer, the Court is persuaded that S.H. would receive some non-trivial educational benefit in classes that, in many instances, were smaller than those lauded by the Parents and available at the Lab School. In such a circumstance, the Court finds the proposed IEP, which would allow S.H. to receive educational benefits while maximizing her interaction with her nondisabled peers, sufficient under the IDEA.

## CONCLUSION

It is not the Court's role to question the Parents' decision to place their child at the Lab School. The school is renowned and the Parents' knowledge of their child and best wishes for

46

her well-being are unquestionable. However, whether FCPS failed to meet the IDEA's requirements and must therefore reimburse the Parents for the cost of private education is a separate question. The IDEA's requirements are not onerous. And whatever their laudable intentions, it remains the Parents' burden to show the FCPS IEPs were insufficient to provide S.H. with some educational benefit. As found by the Hearing Officer, the Parents did not make such a showing. For the IEPs in question, the Hearing Officer rightly concluded that the IEP team proposed goals and placements that were tailored to S.H.'s needs, which would allow her to receive some educational benefit in the least restrictive setting of her local public school.

    An appropriate Order will accompany this Memorandum Opinion.

June 19, 2012
Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge

47